[Civ. No. 4914. Fourth Dist. Mar. 11, 1955.]

VALLEY GROUP PIPE TRADES TRUST FUND et al.,
Appellants, v. L. R. STRAIN PLUMBING AND HEAT-
ING COMPANY, INC. (a Corporation), Respondent.

F. H. McCarthy, Jr., F. Nason O'Hara and Herbert S.
Johnson for Appellants.

Lawrence W. Young for Respondent.

GRIFFIN, J.—This is an action for an accounting between
the plaintiffs and appellants, as members of the Valley Group
Pipe Trades Trust Fund, and defendant and respondent
L. R. Strain Plumbing and Heating Company, Inc., a cor-
poration. It arises out of claimed written collective bar-
gaining agreements, not signed by defendant corporation,
which provide that the employer shall contribute to said
trust fund (welfare fund) 7½ cents per hour for each hour
worked by each employee, for the purpose of purchasing
certain insurance benefits for the employees. The claim is
that although defendant did not sign these instruments, it
did, by oral declarations, promises and acts of the officers

of the corporation, agree to be bound by them and failed to make such payments. The court found against plaintiffs' contentions and found generally that defendant neither "orally agreed or otherwise" to become bound by the agreement to pay any amount into said welfare trust fund, nor did it agree to be bound by the provisions of the collective bargaining agreement and declaration of trust.

Defendant was engaged in the general plumbing and contracting business. It was incorporated in 1948. L. R. Strain was president and principal stockholder. Apparently, defendant was then operating under an agreement dated June 23, 1947, between the "Northern California Conference of the Plumbing and Heating Industry, Inc" (of which defendant was not a member) and such other employers as "may become signatory hereto" and certain listed local unions. The agreement applied to all workmen employed by the individual employers covered by the agreement in which they recognized the union as the sole collective bargaining representative of all such employees performing work over which the union had jurisdiction. Therein the union agreed to furnish competent workmen for the production of all work covered by the agreement. It likewise contained a provision in reference to a contemplated welfare plan in which the parties signatory agreed "subject to any wage stabilization policies" or requirements, that they will establish a health and welfare plan for workmen covered by the agreement to be jointly administered by a board of trustees of five representatives of employers and five representatives of the union, commencing August 1, 1951, and that the individual employer shall pay $.075 per hour for each hour worked by workmen into the welfare fund. It also provided that in the event no welfare fund was established, etc., the $.075 should be returned to the individual employer paying into the fund. It provided that the agreement was to be effective as of June 30, 1951, and remain in force until June 30, 1952, and from year to year thereafter unless 60 days' notice was given of a desire to modify or change its terms. The agreement received in evidence (Ex. 5) does not indicate that defendant became a signatory thereto. The health and welfare plan here referred to was never established or set up under that agreement, and defendant made no payments under it.

A "Master Contract" (Ex. 1) between Northern California Plumbing and Heating Industry, Inc., as employer on behalf

of certain designated employer associations, and individual employers covered by the agreement and the Valley Group Negotiating Committee, was entered into on July 20, 1952. This represented certain specific local unions in different districts, including Fresno Local No. 246, of which L. R. Strain, individually, was a card-holding member. Defendant corporation was not a member of any one of these named associations and it did not sign the agreement. By its terms, among other things (§ 14), provision is made for a welfare plan whereby each individual employer shall pay to the welfare fund $.075 per hour for each hour worked by each employee employed on work covered by the agreement, effective "as of *June 30, 1951,* since January 1, 1952" to July 20, 1952; the fund to be administered by a board of trustees in accordance with the provisions of a trust instrument executed on *June 24, 1952* (Ex. 2) and all payments for hours already worked since January 1, 1952 to April 4, 1952, should be "made in full thirty (30) days from the date of C.I.S.C. approval" and all payments made for hours worked after July 20, 1952, shall be made in accordance with the provisions of the trust agreement (Ex. 2). Exhibit 2 declares and creates a trust fund to be known as Valley Group Pipe Trades Trust Fund. It defines "employer" as used in the agreement to be Northern California Conference of the Plumbing and Heating Industry, Inc., and the Northern California and Central California Negotiating Committee for Industrial Pipe Work Contractors, as representing "individual employers," which means any employer covered by a collective bargaining agreement with the "Union" and who "assents and consents" to participate in and contribute to the fund. It then sets out the powers of the trustees and includes the right to collect said contributions. The agreement and declaration of trust is made effective as of January 1, 1952. It was signed by the parties indicated, the Valley Negotiating Committee, five "Union trustees" and five "Employer trustees." Defendant corporation was not a signatory thereon and was not a member of any of these groups under the name or title indicated.

On July 28, 1952, it is claimed that a circular letter (Ex. 7) was addressed and mailed to L. R. Strain individually, from one Reeves, business manager for the union, advising him that "an Agreement covering Plumbing, Heating, Refrigeration and Piping has been reached effective July 3rd, 1952, between the Northern California Conference of the

Plumbing and Heating Industry, Inc., also the Northern and Central Chapters of the Associated General Contractors of America and the Valley Group Negotiating Committee. The Valley Group Negotiating Committee represents Local Unions 62- 228- 246. . . . Seven and one half ($.075) per hour retroactive to January 1st, 1952, to be paid within 30 days of date of approval which was obtained on July 21st. Employers have until August 20th to send their payments to Valley Group Pipe Trades Trust Fund. . . . Forms will be mailed to you in the near future which will be self explanatory so these payments can be made properly.''

The letter also contained other changes that had been made in reference to wages, overtime, etc. (There is no direct proof that defendant received this letter.) Exhibits 1 and 2 were submitted to Strain for signature, but the corporation refused to sign it. Strain died on September 28, 1952. The corporation ceased to employ members of the union after December, 1952, and it ceased business on February 9, 1953.

It is plaintiffs' contention, as pleaded in their complaint, that notwithstanding defendant corporation was not a signatory of either Exhibits 1 or 2, or a member of any association or group therein mentioned, it did, through its president, Strain, prior to the effective date of the welfare plan, ''agree orally'' with Local Union No. 246, one of the participating unions, ''in consideration of the furnishing'' of workmen to work for defendant corporation by said union, to be bound by all of the provisions of Exhibits 1 and 2, requiring defendant to pay into that trust fund, for the purpose therein indicated, the sum therein provided; that after January 1, 1952, workmen were supplied and defendant refused to pay about $3,000 into that fund. An accounting is sought under these agreements for the period between January 1, 1952, and February 9, 1953.

In support of their contentions plaintiffs cite such cases as *Division of Labor Law Enforcement* v. *Dennis,* 81 Cal. App.2d 306 [183 P.2d 932]; *Los Angeles Traction Co.* v. *Wilshire,* 135 Cal. 654 [67 P. 1086]; *Zurich etc. Assur. Co.* v. *Industrial Acc. Com.,* 132 Cal.App. 101 [22 P.2d 572]; *Beatty* v. *Oakland Sheet Metal etc. Co.,* 111 Cal.App.2d 53 [244 P.2d 25]; *Powers* v. *Journeymen Bricklayers' Union No. 3,* 130 Tenn. 643 [172 S.W. 284, L.R.A. 1915E 1006]; *Grant* v. *Long,* 33 Cal.App.2d 725 [92 P.2d 940]; and *Panno* v. *Russo,* 82 Cal.App.2d 408 [186 P.2d 452].

Defendant denied the allegations of plaintiffs' complaint

and averred that it did not sign nor have a part in the alleged agreements and was not bound thereby, and that nothing was due plaintiffs by reason of such alleged agreements. The learned trial judge filed a memorandum opinion setting forth the related facts and said that the only evidence bearing on plaintiffs' contention that there was an "oral agreement" or an "implied agreement" of Strain to bind the corporation to perform under Exhibit 1 arose as a result of two conversations, after Strain allegedly received the letter of July 28, 1952 (Ex. 7), between the witness Reeves and the deceased Strain, about August 1st, 1952, when it was claimed that "he (Strain) would pay" the welfare charge, and that anything called for by the master agreement was all right with him; and another claimed conversation had with Strain about September 1, 1952, wherein he told him that the union would have to withdraw employees from employers not paying the welfare charge, but that this policy would not apply to Strain because he was paid up.

As pointed out, Strain, at the time of trial, was dead and was unable to testify. Opposed to Reeves' testimony was the testimony of the secretary of the defendant corporation. She unequivocally testified that the corporation had made no payments under the plan, and no payments were ever contemplated by it; that when the written welfare agreement was tendered to defendant corporation for signature defendant corporation refused to execute it; that she saw Strain in his office many times a day and she never heard any conversation with Reeves in which Strain agreed to pay any money into such a fund; that on the other hand, Strain told her not to sign Exhibits 1 and 2 on behalf of the corporation, and that she subsequently told Reeves, after Strain's death, that the corporation had refused to sign such agreements.

█ The court specifically found that plaintiffs did not supply "clear and convincing" proof of such an oral agreement. It has been held that uncorroborated testimony as to an alleged declaration of a deceased person is the weakest kind of evidence and is open to suspicion; that where admissible at all it will be received and weighed by the trier of facts the same as other evidence and may be disregarded when shown to be unbelievable or unsubstantial. (*Estate of Emerson,* 175 Cal. 724, 727 [167 P. 149]; *Ostertag* v. *Bethlehem Shipbuilding Corp.,* 65 Cal.App.2d 795, 800 [151 P.2d 647]; *Rogers* v. *City of Los Angeles,* 6 Cal.App.2d 294, 296 [44

P.2d 465] ; 10 Cal.Jur. p. 1097, § 329.) This finding has evidentiary support and the trial judge was justified in disregarding such testimony.

It is now argued in the briefs that there was a liability under Exhibits 1 and 2 because of some "implied" agreement on the part of defendant corporation to accept the terms thereof because of the claimed receipt of the letter indicated, without repudiation of its terms, and because of the acts of defendant corporation in hiring, and the union in furnishing workmen through the local indicated, without notice that defendant had repudiated the contract. It is then claimed that the offer of the union to furnish workmen and the acceptance by defendant of that offer, bound defendant to the same extent as if it had been a signatory thereto.

It was pointed out by the trial judge that Exhibit 1 purports to bind those employers signatory thereto, or members of organizations signatory thereto, and that the term "individual employer" is defined therein as "all holders of one or more contractor's license . . . who are members of the employer or any of the employer associations" set out and "any nonmember holder" of one or more such licenses, who may, *"with the written consent of the Union,* execute this agreement." He held that from the facts stipulated, defendant corporation fell only within the term "non-member holder." It was stated that defendant corporation, at no time, executed the agreement, with the *written consent of the union,* or otherwise. The letter (Ex. 7) even if received by defendant corporation, does not appear to be an offer. It is information only to parties operating under or signatory to it, and appears to be a notice by the union to Strain that non-signers to Exhibit 1 were being informed of the provisions of the new agreement, which constituted changes to preexisting bargaining agreements, and that the union was extending its assent to the signing of the agreement by the recipient of the letter. The placing of the agreements in defendant's possession for signature, and its apparent refusal to sign them rather indicates that before defendant was to be bound by their terms it would be necessary for the defendant to sign them through the duly authorized act of the corporation. Apparently the agent for the union was notified of the refusal of the corporation to sign them. This evidence indicates that no ratification was intended by the corporation. The evidence further indicates that the union had other knowledge that they were not signed and that the corporation had

not assented to them. After Strain's death Reeves endeavored to have the secretary of the corporation sign them. The union's agent testified that he told Strain, about three weeks before his death, that the workmen furnished by the union would be withdrawn if defendant did not comform to the agreements and pay the money into the welfare fund, and Strain said ''We are paid in.'' Apparently no money was paid into the welfare fund and the workmen were not withdrawn. Whether the union was furnishing workmen under the old agreement or under some claimed oral agreement is not clear from the evidence.

Considering the evidence in its most favorable light in support of the findings and judgment, as we must do, it fully supports the conclusion reached by the trial court that no ''implied'' agreement to bind the corporation to pay into the welfare fund the sum claimed was established. Where the evidence is conflicting, as here, this court is bound by the time-honored rule that the trier of fact is the sole judge of the weight of the evidence, and we must presume that the evidence in support of the verdict or finding is true and will construe any substantial conflict in support of it. (4 Cal.Jur.2d p. 449, § 575.) It cannot be said that plaintiffs have established, *as a matter of law,* an oral or implied agreement that the corporation would be bound by the written agreements.

Since the findings and judgment are supported on the grounds indicated, it becomes unnecessary to decide other claimed contentions of defendant why the judgment should be affirmed, i.e., that the alleged. oral agreement violated the statute of frauds (Civ. Code, § 1624, subd. 1) and that it lacked mutuality and was not supported by any consideration.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied April 4, 1955, and appellants' petition for a hearing by the Supreme Court was denied May 4, 1955.